**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| NFS LEASING, INC.,<br>　　　*Plaintiff*,<br><br>v.<br><br>SIGNALSHARE, LLC, SIGNAL POINT<br>HOLDINGS CORP., CHRISTOPHER<br>BARNES and JOSEPH COSTANZO,<br>　　　*Defendants*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No. 16-10130

## COMPLAINT

### I.    Introduction

1.    The Plaintiff NFS Leasing, Inc. ("NFS") is an equipment lessor and lender. Commencing in 2013, NFS entered into a series of equipment leases with the Defendant SignalShare, LLC ("SS") for equipment to be used by SS in its business of providing Wi-Fi (and other) services to stadiums and other sporting venues around the country. NFS initially financed in excess of $5 million of equipment in connection with various equipment leases with SS.

2.    Following the initial legitimate lease transactions, SS in conspiracy with others started requesting financing from NFS for the purchase of equipment to be used to implement fictitious contracts which SS misrepresented to NFS it had entered into. SS obtained the funds through fraudulent misrepresentations and the provision to NFS of forged, altered and falsified documents. Through such fraudulent conduct, SS succeeded in fraudulently obtaining an additional almost $5 million in financing from NFS which was utilized for purposes other than what was represented. In total SS received approximately $9.8 million in financing from NFS.

3.    NFS discovered the fraud perpetrated against it in June of 2015 and SS confessed to the fraud and agreed to convert the fraudulent equipment leases into an agreement, including a

rapidly amortizing term note to be secured by an all-asset first lien on SS' assets and guarantied by the Defendants Signal Point Holdings Corp. ("SPHC"), Christopher Barnes ("Barnes") and Joseph Costanzo ("Costanzo").

4.     SS has defaulted on its payment obligations to NFS and NFS brings this action to recover all amounts owed it and to enforce its security interests in the assets of SS and SPHC.

## II.      Jurisdiction and Venue

5.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332. The parties are citizens of different states and the amount in controversy exceeds $75,000.

6.     Venue in the District of Massachusetts is proper pursuant to 28 U.S.C. § 1391(a)(2) in that: (a) the lease and loan documents between the parties contain a consent to jurisdiction in Massachusetts; (b) a substantial part of the fraud, events or omissions giving rise to the claims occurred in Massachusetts and caused tortious injury in Massachusetts.

## III.      Parties

7.     NFS is a corporation duly organized under the laws of the Commonwealth of Massachusetts with a principal place of business at 900 Cummings Center, Suite 226-U , Beverly, Massachusetts 01915.

8.     SS is a Delaware limited liability company with a principal place of business located at 433 Hackensack Avenue, 6th Floor, Hackensack, New Jersey 07601.

9.     SPHC is a Delaware corporation with a principal place of business at 433 Hackensack Avenue, 6th Floor, Hackensack, New Jersey 07601.

10.     Barnes is an individual residing at 26 Veilwood Circle, The Woodlands, Texas 77382.

11.     Costanzo is an individual residing at 309 Governor Safford Lane, Emerald Isle, North Carolina 28594.

12.     SS is a wholly owned subsidiary of SPHC. Upon information and belief SPHC is the sole member in SS. Controlling ownership in SPHC, in turn, is vested in Roomlinx, Inc., a publicly traded company.

**IV.     The Initial Legitimate Equipment Lease Schedules**

13.     SS is in the business of providing Wi-Fi and other services to sports stadiums, arenas and teams around the country.

14.     In connection with its business, SS approached NFS in early 2013 seeking financing for SS' acquisition of the equipment needed in the provision of Wi-Fi services to its customers.

15.     On or about March 11, 2013, NFS and SS entered into a Master Equipment Lease Agreement (the "Master Lease") setting forth the terms pursuant to which NFS would acquire equipment on behalf of SS and then lease it to SS pursuant to certain Lease Schedules to be executed in connection with each new transaction. A copy of the Master Lease is attached hereto as Exhibit "A."

16.     Pursuant to their agreement, when SS entered into a contract with one of its customers, it would order the requisite equipment and direct that it be sold and invoiced to NFS. NFS and SS would then, in turn, enter into a new Lease Schedule setting forth the payment terms pursuant to which SS leased the purchased equipment from NFS.

17.     Initially, when the equipment to be leased under a particular Lease Schedule was delivered by the vendor, SS would provide NFS with an acceptance certificate for the equipment,

and in response NFS would release payment to the vendor and SS would become obligated to commence making monthly payments to NFS under that Lease Schedule.

18.     Pursuant to the Master Lease, NFS commenced providing financing for the purchase of equipment needed by SS in April of 2013.

19.     SS and NFS entered into a number of legitimate equipment Lease Schedules relating to the installation and provision of Wi-Fi to various arenas, including, the Sacramento Kings' arena, the Golden State Warriors' arena, the Houston Rockets' arena, the Detroit Red Wings' arena and the University of Maryland's stadium.

20.     Given the significant number of transactions, in 2014 the parties simplified the procedure on new leases, whereby on request and certification that the equipment had been received and accepted by SS, NFS would provide the funding for the needed equipment directly to SS. The certification of receipt and acceptance would also trigger the obligation to make payments under the Lease Schedule.

21.     Between March 11, 2013 and October of 2014, NFS and SS entered into a series of Lease Schedules representing legitimate equipment leases between the parties (the "Legitimate Leases"). The Lease Schedules relating to the Legitimate Leases are attached hereto collectively as Exhibit "B."

22.     In connection with each of the Lease Schedules between the parties NFS caused to be filed with the Delaware Division of Corporations "informational" UCC filings to reflect that the equipment being leased to SS was owned by NFS.

23.     In addition, given the increasing size of the financing transactions between NFS and SS, on or about July 3, 2014 SS executed an all-asset Security Agreement (the "SS Security Agreement") in favor of NFS granting it a security interest in all of SS' assets as additional

4

collateral for the amounts owed under the Master Lease and the various Lease Schedules executed thereunder. A true and accurate copy of the SS Security Agreement is attached hereto as Exhibit "C."

24.     As further security for the amounts owed by SS to NFS, on January 21, 2015, SPHC executed a Corporate Guaranty Agreement (the "First SPHC Guaranty") in favor of NFS whereby it guarantied all amounts owed by its subsidiary SS to NFS. A true and accurate copy of the First SPHC Guaranty is attached hereto as Exhibit "D."

25.     In addition to the lease obligations, NFS loaned SS funds pursuant to two promissory notes (collectively referred to herein as the "Additional Loan Notes") as follows:

a.     Promissory note dated April 8, 2015 in the original principal amount of $235,534.24; and
b.     Promissory note dated June 12, 2015 in the original principal amount of $868,665.75.

True and accurate copies of the Additional Loan Notes are attached hereto collectively as Exhibit "E."

## V.     The Fictitious Lease Schedules

26.     Commencing with a Lease Schedule signed by SS on May 14, 2014, SS began seeking funds from NFS for fictitious, non-existent transactions. SS would represent to NFS that it had entered into an agreement with a sports arena or team and would induce NFS to provide funding for the acquisition of the allegedly-needed equipment. In connection with these requests, SS would provide NFS with forged/fake invoices for the equipment it had allegedly ordered and/or provide fictitious "serial numbers" for items allegedly purchased and installed pursuant to the fraudulent contracts.

27.     Barnes was the SS employee primarily interacting with NFS. For each of the fraudulent leases, Barnes executed Lease Schedules on behalf of SS and their related "Schedule C Acceptance Certificate" to the Lease Schedules in which he represented that:

> Pursuant to the above referenced Schedule and Master Lease, Lessee by its below signature, hereby certifies that the Units of Equipment described in the Schedule and below have been delivered by the Supplier of such Equipment at the location of Lessee described herein, have been inspected by authorized representatives of Lessee, have been found to be in good repair, condition and working order and are accepted by Lessee as Equipment under the Schedule on the applicable Delivery date set forth below.

28.     Between May 20, 2014 and May 21, 2015, SS induced NFS to advance funds on ten fraudulent lease transactions (the "Fraudulent Leases"). In connection with the Fraudulent Leases, NFS advanced approximately $4.9 million to SS. Copies of the Lease Schedules for Fraudulent Leases executed by Barnes and the related delivery and acceptance certificates (Schedule C) are attached hereto collectively as Exhibit "F."

29.     Upon information and belief, other individuals associated with either SS or SPHC assisted in the scheme to defraud NFS.

**VI.     NFS Discovers the Fraud and Agrees to Recast the Fraudulent Debt into a Promissory Note**

30.     As a result of a misdirected email received by NFS from SS on or about June 24, 2015, NFS became suspicious of the legitimacy of the transactions against which it had advanced funds to SS. Following an investigation NFS learned that ten of the Lease Schedules by and between NFS and SS were fraudulent in that the underlying contracts between SS and arenas and sports venues were fictitious and did not exist, the ostensible equipment purchases financed by NFS had not taken place and the requests for funds were fraudulent and the funds had been diverted.

31.     In connection with its investigation of the facts and circumstances surrounding the fraudulent Lease Schedules, SS admitted that SS had misrepresented that it had agreements with arenas and teams and had misrepresented that it had received and accepted equipment in connection therewith, all in order to obtain funds from NFS, which funds SS then diverted to other uses.

32.     In response to NFS' discovery of the fraud perpetrated against it, SS made certain internal changes and removed certain officers and employees and pleaded with NFS not to immediately declare defaults, assert fraud claims and commence exercising rights and remedies.

33.     In light of these pleas and given that the alternative to permitting a termed-out repayment of the fraudulently-obtained funds would likely result in some manner of insolvency proceeding and since SS' business appeared to have the potential to grow and permit repayment of the amounts defrauded from NFS, NFS agreed to consider a relatively short term repayment of those amounts.

34.     Following negotiations, the parties agreed that the amounts due on account of the Fraudulent Leases, along with some smaller amounts owed under certain Legitimate Leases reflecting failed lease transactions, would be recast into a Term Note (the "Note") in the negotiated amount of $4,946,212.91 with a December 19, 2016 maturity. The Note would provide for weekly payment of $71,207.24. The remaining Legitimate Leases would continue in full force and effect.

35.     Set forth below are the Lease Schedules incorporated into the Note and the legitimate Lease Schedules which were to continue in effect:

| Lease Schedule | Date SS Signed | Commence-ment Date | Term | Type of Lease | Terminated by Note Agreement | Continuing Lease | Classify as Fraud |
|---|---|---|---|---|---|---|---|
| MLA | 3/11/13 | X | | | | | |
| SignalShare 01 | 3/11/13 | 4/1/13 | 48 | FMV-No cap | Yes | | No |
| SignalShare 02 | 3/25/13 | 4/1/13 | 50 | $ out | Yes | | No |
| SignalShare 03 | 3/25/13 | 4/1/13 | 48 | FMV-No cap | Yes | | No |
| SignalShare 04 (Kings) | 8/2/13 | 7/1/13 | 36 | FMV-No cap | | Yes | |

| Lease Schedule | Date SS Signed | Commence-ment Date | Term | Type of Lease | Terminated by Note Agreement | Continuing Lease | Classify as Fraud |
|---|---|---|---|---|---|---|---|
| SignalShare 05 (Kings) | 11/5/13 | 11/1/13 | 36 | FMV-No cap | | Yes | |
| 6-PACERS | 12/6/13 | 11/30/13 | 8 | $ out | n/a-completed | | |
| SignalShare 07 (Patriots) | 11/19/13 | 12/1/13 | 36 | $ out | Yes | | No |
| SignalShare 08 (Redwings) | 12/11/13 | 2/1/14 | 48 | FMV-No cap | Yes | | |
| SignalShare 09 | 12/19/13 | 3/1/14 | 36 | $ out | Yes | | No |
| SignalShare 10 (UMD) | 2/28/14 | 3/1/14 | 48 | FMV-No cap | | Yes | |
| SignalShare 11 | 3/28/14 | 4/1/14 | 36 | FMV-No cap | Yes | | No |
| 12-ETA-SANDS | 6/19/14 | extended terms | | | n/a-completed | | |
| SignalShare 13 (Kings) | 4/16/14 | 5/1/14 | 42 | FMV-No cap | | Yes | |
| SignalShare 14 (Rockets) | 4/30/14 | 5/1/14 | 42 | FMV-No cap | | Yes | |
| SignalShare 15 (Verizon) | 5/14/14 | 6/1/14 | 36 | FMV-No cap | Yes | | Yes |
| SignalShare 16 (Redwings) | 5/19/14 | 6/1/14 | 36 | FMV-No cap | | Yes | |
| SignalShare 17 (UMD) | 7/10/14 | 8/1/14 | 36 | FMV-No cap | | Yes | |
| SignalShare 18 (Live Nation) | 7/25/14 | 8/1/14 | 48 | FMV-No cap | | Yes | |
| SignalShare 19 (Wichita State) | 8/27/14 | 9/1/14 | 36 | FMV-No cap | Yes | | Yes |
| SignalShare 20 (UMD) | 9/26/14 | 10/1/14 | 36 | FMV-No cap | | Yes | |
| SignalShare 21 (Warriors) | 10/10/14 | 11/1/14 | 36 | FMV-No cap | | Yes | |
| SignalShare 22 (Homestead) | 10/31/14 | 11/1/14 | 36 | FMV-No cap | Yes | | Yes |
| SignalShare 23 (Epic Systems) | 11/17/14 | 12/1/14 | 36 | FMV-No cap | Yes | | Yes |
| SignalShare 24 (Texas Tech) | 12/3/14 | 12/1/14 | 36 | FMV-No cap | Yes | | Yes |
| SignalShare 25 (Liberty) | 12/16/14 | 12/1/14 | 36 | FMV-No cap | Yes | | Yes |
| SignalShare 26 (Temple) | 12/29/14 | 1/1/15 | 36 | FMV-No cap | Yes | | Yes |
| SignalShare 27 (Milwaukee Bucks) | 2/5/15 | 3/1/15 | 36 | FMV-No cap | Yes | | Yes |
| SignalShare 28 (Georgia Tech) | 2/18/15 | 3/1/15 | 36 | FMV-No cap | Yes | | Yes |
| SignalShare 29 (Downington, PA) | 5/5/15 | 5/1/15 | 36 | FMV-No cap | | Yes | |
| SignalShare 30 (Royal Farms) | 5/20/15 | 6/1/15 | 36 | FMV-No cap | Yes | | Yes |

36.     The parties further agreed that the Note would be guarantied by SPHC, Barnes and Costanzo (the "Second SPHC Guaranty," the "Barnes Guaranty" and the "Costanzo Guaranty," respectively) and that SPHC's First and Second Guaranties would be further secured by a junior security interest in all of the assets of SPHC, pursuant to a Security Agreement (the "SPHC Security Agreement").

37.     As part of the proposed workout the parties also negotiated a Lease Schedule Termination and General Release Agreement (the "Lease Termination Agreement").

38.     Finally, the parties agreed that SS would execute a First Amendment to Security Agreement (the "Amendment") reaffirming the terms of the July 2014 Security Agreement, including that NFS would be the sole secured creditor holding a lien on SS' assets.

39.     The Lease Termination Agreement provides at section 5.1.e. that:

The Borrower [SS] shall not create, permit to be created or suffer to exist any security interest, mortgage, lien or other encumbrance upon any material asset or property of the Borrower….. and as otherwise subsequently expressly permitted by the Lender [NFS] in writing.

40.     A true and accurate copy of the Note is attached hereto as Exhibit "G."

41.     A true and accurate copy of the Second SPHC Guaranty is attached hereto as Exhibit "H."

42.     A true and accurate copy of the Barnes Guaranty is attached hereto as Exhibit "I."

43.     A true and accurate copy of the Costanzo Guaranty is attached hereto as Exhibit "J."

44.     A true and accurate copy of the SPHC Security Agreement is attached hereto as Exhibit "K."

45.     A true and accurate copy of the Amendment is attached hereto as Exhibit "L."

46.     A true and accurate copy of the Lease Termination Agreement is attached hereto as Exhibit "M."

47.     The Note, the Second SPHC Guaranty, the Barnes Guaranty, the Costanzo Guaranty, the SPHC Security Agreement, the Amendment and the Lease Termination Agreement are sometimes collectively referred to herein as the "Fraud Workout Documents."

48.     On or about November 13, 2015, NFS, SS, SPHC and certain other secured creditors of SS and SPHC entered into an Intercreditor, Modification and Settlement Agreement (the "Intercreditor Agreement"), wherein the relative priorities of the security interests of NFS and SS' and SPHC's other secured creditors were clarified. A true and accurate copy of the Intercreditor Agreement is attached hereto as Exhibit "N."

49.     NFS is informed that in further breach of its contractual and legal obligations, SS may have purported to sell the equipment it leased from NFS to some of the sporting venues and arenas SS entered into agreements with, thereby attempting to sell equipment that did not belong to it.

## VII.    The Default

50.     Due to SS' default, NFS sent Notice of Default to SS declaring a default under the Lease Termination Agreement. The Lease Termination Agreement provides that a default thereunder gives rise to a default under the Master Lease and all Lease Schedules thereunder.

51.     In addition, SS is in default of the Additional Loan Notes by failing to make payments as called for therein.

52.     As of January 19, 2016 NFS is owed as follows:

| | |
|---|---|
| Master Lease and related Lease Schedules (plus continuing interest, costs and attorneys' fees): | $2,778,625.64 |
| Personal property taxes advanced by NFS: | $64,806.24 |
| Additional Loan Notes (plus continuing interest, costs and attorneys' fees): | $146,432.26 |
| Lease Termination Agreement (plus continuing interest, costs and attorneys' fees): | $4,838,703.48 |
| **Total (plus continuing interest, costs and attorneys' fees):** | **$7,828,567.61** |

53.     Despite demand, the balances owing remain unpaid.

## VIII.    Causes of Action

**Count I–Action on Account of Defaulted Lease Termination Agreement, Leases, Note, and Guaranties (Against Defendants SS, SPHC, Barnes and Costanzo)**

54.     NFS repeats and realleges the allegations set forth in the previous paragraphs of the Complaint as if fully restated herein.

55.     SS is indebted to NFS in the amount of $7,828,567.61, plus continuing interest, costs and attorneys' fees, on account of the defaulted equipment leases, the Additional Loan Notes and the Lease Termination Agreement and the Note.

56.     SPHC, Barnes and Costanzo are indebted to NFS in the amount of $7,828,567.61, plus continuing interest, costs and attorneys' fees, on account of SPHC's First and Second Guaranties, the Barnes Guaranty and the Costanzo Guaranty that each executed.

## Count II–Preservation and Enforcement of Security Interests
### (Against Defendants SS and SPHC)

57.     NFS repeats and realleges the allegations set forth in the previous paragraphs of the Complaint as if fully restated herein.

58.     NFS is informed and therefore believes that both SS and SPHC may seek to transfer, encumber or secrete assets in which NFS holds a security interest in order to thwart NFS from pursuing its rights as a secured party.

59.     As a result in this count NFS is seeking a preliminary injunction enjoining and restraining SS and SPHC and their respective officers, servants, agents, employees and attorneys and any and all persons acting in concert with them from transferring any of their assets, including but not limited to any contract rights, accounts receivable, general intangibles, machinery and equipment, equity or ownership interests in any other companies, intellectual property including their rights in any software, funds, or accounts outside of the ordinary course of business.

60.     NFS further seeks injunctive relief enjoining and restraining SS and SPHC and their respective officers, servants, agents, employees and attorneys and any and all persons acting in concert with them from hindering or interfering with or impeding NFS' exercise of its rights to

recover the leased equipment previously leased by SS from NFS pursuant to its rights to recover same upon default as set forth in the Master Lease.

61.     NFS further seeks injunctive relief enjoining and restraining SS and SPHC and their respective officers, servants, agents, employees and attorneys and any and all persons acting in concert with them from hindering or interfering with or impeding NFS' exercise of its rights to instruct customers of SS to direct all future payments owed to SS on account of any account receivable, contract, general intangible or other form of obligation, directly to NFS in accordance with its rights as secured party.

62.     Finally, NFS seeks an order of this Court directing SS and SPHC to provide NFS with a listing of all of their assets, their location and description and directing that SS and SPHC cooperate with NFS in the liquidation of same.

63.     NFS requires the injunctive relief requested to protect its rights in the collateral given to it pursuant to the SS and SPHC Security Agreements. Absent such relief NFS will be irreparably harmed because, NFS is informed and therefore believes that, SS and SPHC have limited assets and that its only avenue for a partial recovery on its claims lies in the collateral it received pursuant to the SS and SPHC Security Agreements. To the extent collateral is dissipated, expended, secreted or otherwise disposed of by SS or SPHC, NFS will have further unrecoverable amounts on the outstanding obligations owed to it.

Wherefore, the Plaintiff NFS Leasing, Inc. prays that:

i.      Judgment enter against the Defendants SignalShare, LLC, Signal Point Holdings Corp., Christopher Barnes and Joseph Costanzo on account of all amounts owed to NFS Leasing, Inc. arising out of the Legitimate Leases, the Lease Termination Agreement and the Term Note or the Guaranties thereof, plus continuing interest, costs and attorneys' fees;

ii.      A preliminary injunction enter enjoining and restraining SignalShare, LLC and Signal Point Holdings Corp. and their respective officers, servants, agents, employees and attorneys and any and all persons acting in concert with them from transferring, encumbering or otherwise disposing of any of their assets, including but not limited to any contract rights, accounts receivable, rights to payments, general intangibles, machinery and equipment, equity or ownership interests in any other companies or subsidiaries, intellectual property including their rights in any software, funds, or any other asset outside of the ordinary course of business;

iii.      A preliminary injunction enter enjoining and restraining SignalShare, LLC from selling, transferring, pledging, encumbering, or otherwise disposing of any item of equipment leased from NFS Leasing, Inc. or any proceeds resulting from any previous sale, transfer, pledge, encumbrance or disposition of such equipment;

iv.      A preliminary injunction enter enjoining and restraining SignalShare, LLC and Signal Point Holdings Corp. and their respective officers, servants, agents, employees and attorneys and any and all persons acting in concert with them from hindering or interfering with or impeding NFS Leasing, Inc.'s exercise of its rights to recover the leased equipment previously leased by SignalShare, LLC by NFS Leasing, Inc.;

v.      A preliminary injunction enter enjoining and restraining SignalShare, LLC and Signal Point Holdings Corp. and their respective officers, servants, agents, employees and attorneys and any and all persons acting in concert with them from hindering or interfering with or impeding NFS Leasing, Inc.'s exercise of its rights to receive all future payments owed to SignalShare, LLC on account of any account receivable, contract, general intangible or other payment obligation, directly from such parties;

vi.      A preliminary injunction enter ordering SignalShare, LLC and Signal Point Holdings Corp. to provide NFS Leasing, Inc. with a listing of all of their assets, their location and description and directing that SignalShare, LLC and Signal Point Holdings Corp. to cooperate with NFS Leasing, Inc. in its liquidation of such assets;

vii.     A preliminary injunction enter ordering SignalShare, LLC not to use, expend, assign, pledge, encumber, or otherwise dispose of any funds received, or its right to receive funds, from its customers, including but not limited to the Sacramento Kings and their arena, the Golden State Warriors and their arena, the Houston Rockets and their arena, the Detroit Red Wings and their arena and the University of Maryland and its stadium and further ordering and directing that SignalShare, LLC pay any and all such amounts to NFS Leasing, Inc. immediately upon their receipt; and

viii.    This Court grant NFS Leasing, Inc. such further relief as it deems just.

Dated:  January 28, 2016            Plaintiff,
                                    NFS LEASING, INC.,
                                    By its attorneys,

                                    /s/ Richard E. Gentilli
                                    Richard E. Gentilli, BBO # 189080
                                    Howard M. Brown, BBO # 547948
                                    Sarah A. Smegal, BBO # 655114
                                    Hackett Feinberg P.C.
                                    155 Federal Street, 9th Floor
                                    Boston, MA 02110
                                    Phone: (617) 422-0200
                                    Fax: (617) 422-0383
                                    Email: reg@bostonbusinesslaw.com
                                           hmb@bostonbusinesslaw.com
                                           sas@bostonbusinesslaw.com